SUCCESSION OF SARAH BAUM—JOHN D. FINK, Dative Testamentary
Executor, Appellant.

All the effects or property in the possession of the spouses, or either, at the time of the
dissolution of the community by death, are presumed to belong to the community.
C. C. 2374.

The heirs of a wife may renounce the community, for the purpose of exonerating them-
selves from the debts contracted during the marriage (C. C. 2379); but the husband,
having been the head thereof, can never do so, either directly or indirectly.

Where a commission to take testimony is addressed to a resident of another State by
name, as a special commissioner, he becomes an officer of the court for that purpose,
and no proof is required of his qualifications to discharge the duties imposed on him.

Where the facts intended to be proved under a commission, taken out by parties who
intervened for the purpose of prosecuting the suit for their own benefit, as creditors of
the plaintiff, on an allegation that he was about to abandon it, go to support the al-
legations of the petition, the plaintiff cannot exclude the evidence, on the ground
that he had no opportunity to cross-examine the witnesses.

Where the rights of a plaintiff in an action against a succession have been seized under
a *fi. fa.*, he cannot discontinue.

The creditors of one who had commenced an action against a succession, claiming to
have been the husband of the deceased, and to be entitled, as such, to one half of the
property in her possession at the time of her death as community property, may in-
tervene and prosecute the claim, where they apprehend that the plaintiff is about to
abandon it for the purpose of defrauding them. C. C. 1985.

Where one claiming under a *fi. fa.* produces the judgment, execution, sheriff's return
thereon, and act of sale, it will be presumed that the formalities of the law have been
complied with. It is for the other party to show that they have not been complied
with.

An action having been commenced by a party to cause himself to be recognised as the
husband of the deceased, claiming his portion of certain property as having belong-
ed to the community, his creditors intervened, praying to be allowed to prosecute
the suit, on the ground that plaintiff was about to abandon it for the purpose of de-
frauding them. A supplemental intervention was subsequently filed by the same
parties, alleging, that since the date of their intervention, they had purchased all the
rights of the plaintiff in the action, and praying to be allowed to prosecute it to a
decision. On an exception that the supplemental intervention set up a new cause of
action, and was therefore inadmissible: *Held,* that the supplemental intervention
does not in any manner change the substance of the original demand that the plain-
tiff be recognized as the husband of the deceased, but merely the parties to the pro-
ceedings, and that it should be received. C. P. 364.

Plaintiff having commenced an action against a succession to cause himself to be ac-
knowledged as the husband of the deceased, neglected for more than three years to
take any steps in it, when certain creditors intervened, praying to be allowed to pros-
ecute the action on the ground that the plaintiff was about to abandon it for the pur-
pose of defrauding them. The latter subsequently attempted to discontinue, but his

motion was overruled. *Held*, that the prescription of one year established by art. 1989 of the Civil Code is inapplicable to the claim of the intervenors, who do not seek to revoke any contract or act of any kind, but simply to intervene in an action for the protection of their rights.

APPEAL from the Court of Probates of New Orleans, *Bermudez*, J.

*Hoffman*, for the appellant.

*F. B. Conrad* and *J. C. Clarke*, for the intervenors.

*H. D. Ogden*, for Kellar.

*McHenry*, for Powell.

SIMON, J. The judgment appealed from in this case by the dative testamenty executor of the estate of Sarah Baum, deceased, and also complained of by John Kellar, the original plaintiff in the action, decides, that said *John Kellar was the lawful husband of Sarah Baum;* that all the effects possessed by said Kellar and the deceased are common *acquests;* and, accordingly, orders that an inventory of the property held by them at the dissolution of the community be made before a notary public, and appoints two appraisers for that purpose.

For the better understanding of the subject in controversy, it is first necessary to advert to certain facts which preceded the death of Sarah Baum, which happened in March, 1839; to dispose of the question of marriage upon which this suit was instituted; and to examine the course of conduct of the plaintiff, with regard to the interest by him claimed in the community, since the decease of his wife.

The evidence shows fully that John Kellar and Sarah Baum, lived together as husband and wife, in Shippingport, Kentucky, in or about the year 1818, and subsequently, after having been married in a neighboring State. They resided at that place until about 1821, when they both went away, and it was generally understood at Shippingport that they went to New Orleans. Two witnesses, who were examined in Kentucky, prove that they were present at the marriage ceremony, and that it took place at Clarksville, in Clark county, in the State of Indiana, opposite to Shippingport, before Jacob Brookhart, Esq. who, as the witnesses state, was acting as a justice of the peace at the time of, before, and after said marriage. After their arrival in

New Orleans, they were generally considered as man and wife; they lived together in the same house; one of the witnesses says he was always in the habit of calling Sarah Baum, "Mrs. Kellar;" that she was known by that name; and that they had the reputation of being man and wife. Another witness states that he became acquainted with Kellar, about the year 1827; that, about that time, he came down the river with Kellar and his reputed wife; that she was called Mrs. Kellar; and that he, witness, was introduced to her as his, Kellar's, wife. She lived with Kellar until the time of her death; and although another witness, who proves that she was called in New Orleans "Mrs. Kellar," and that he heard her husband call her by that name, states in his testimony that she was not called so in Louisville, and that he thinks she was not married, we cannot hesitate to say that the fact of the marriage of Kellar with Sarah Baum is fully and satisfactorily established by the testimony, and that, from the evidence, there can exist no doubt of her being Kellar's wife at the time of her death.

It is clear, therefore, that John Kellar was the head, or master of the community which had legally existed between him and Sarah Baum; that said community was dissolved by the death of the wife, in March, 1839; and that all the effects and property then in the possession of the spouses, or of either of them, are necessarily presumed to belong to the said community. Civil Code, art. 2374. The heirs of the wife had the privilege of renouncing the partnership or community of gains, to exonerate themselves from the debts contracted during the marriage (Civil Code, art. 2379); but the husband, being the head and master thereof, could never do so, either directly or indirectly.

It appears, however, that some time before the death of his wife, there was a suit brought against Kellar for a debt of his contracting, in a chancery court in Kentucky, (the record of which, though produced in evidence in this suit, is not in the record,) in which, Kellar's deposition was taken *to disprove his marriage* with Sarah Baum, (this deposition is not in the record,) and that the deceased wrote to him from Louisville, on the 17th of July, 1831, the following instructions, clearly relating to said suit; "Mr. D. . ., has sent those depositions down in a letter

directed to me, and I want you to go to the office and take the letter out, and open it, *take the depositions to D. . ., and you and him state that I am not your wife, and that the property is mine.*" This letter, which wants no comment as to the object for which it was written, shows conclusively that Kellar's deposition, which has not been furnished to us, was nothing but a false statement of facts which he knew to be untrue ; and if it is true that he swore that he was not married to Sarah Baum, it is obvious that his only object was to comply with the instructions of his wife, for the purpose we presume of protecting his property from being seized, or otherwise taken from him. Had Kellar's deposition been before us, we should have thought it our duty to disregard it.

But it further appears that Kellar soon lost sight of his false deposition, for the present suit was instituted by him on the 14th of May, 1839, against the testamentary executor of the estate of Sarah Baum, for the purpose of claiming, *as the lawful husband of the deceased,* to be recognized as entitled to his share of the community property, whether in his, or his wife's name, and of causing an inventory thereof to be made. Kellar's petition was answered by the testamentary executor, on the 28th of May, 1839, denying all the allegations of the plaintiff's petition, and referring to the suit in Kentucky, as evidence of his not being the lawful husband of the deceased, *from his own declaration* as a witness therein, &c.; and the present suit remained unacted upon on the docket of the court *a qua*, until the 4th of November, 1842, when the New Orleans Canal and Banking Company, being creditors of the plaintiff Kellar, by virtue of certain judgments duly transferred over to the said company, and fearing that their debtor, who was in insolvent circumstances, would desist from prosecuting his action, as he had refused to prosecute the same by taking no step therein for more than three years past, obtained leave to intervene and to prosecute and exercise the rights of their debtor, as husband and partner in community of Sarah Baum, contradictorily with the testamentary executor of the deceased, and with the tutor of her grand child and only heir, and prayed that Kellar might be recognised as the husband of the deceased, and joint owner of the community property, &c.

On the 17th of December, 1842, Kellar obtained leave, on motion, to discontinue his case; but, on a subsequent motion made by the intervenors' counsel, and on his showing that, at the time the discontinuance was moved for and granted, the suit was under seizure, and on the eve of adjudication under a forced sale, the same was reinstated on the docket, and the order to discontinue was annulled and rescinded. The intervenors' petition was answered by the executor, who pleaded the general issue, and denied specially that Kellar was ever married to the deceased.

On the 16th of January, 1843, the intervenors filed a supplemental intervening petition, in which they set up that, on the 17th of December preceding, they purchased at sheriff's sale, at auction, all the right, title and claims of John Kellar to the present suit, pretending to be authorised, by virtue of said purchase, to procecute his said rights to a final adjustment and termination, and praying accordingly. This supplemental petition was also answered by the executor, who pleaded the general issue, excepted to the jurisdiction of the court, and averred that the proceedings under which the sale of Kellar's rights was made, were illegal and irregular, without any legal advertisement and appraisement, and consequently null and void. The testamentary executor subsequently filed a plea of prescription, said to have been acquired previous to the filing of the petition of intervention.

The record further shows that, on the 31st of May, 1831, a suit was brought by one W. T. Huff, against John Kellar, in the Commercial Court, based upon the fact of the defendant's having employed him to procure the proof of his, Kellar's, having been lawfully married to Sarah Baum, in Indiana, and of his, plaintiff's, having succeeded in finding the necessary evidence to substantiate Kellar's claim under the said marriage, claiming from the latter the sum of $1,500, as a just compensation for his services, according to a written agreement filed with the plaintiff's petition. Said petition is accompanied by a certificate and declaration of an individual, showing the marriage of Kellar with Sarah Baum, in Clark county, Indiana, and by divers letters written by Kellar and his counsel to the claimant, in May,

June, and July, 1839, disclosing clearly that said claimant was employed by Kellar for the purpose of procuring the evidence necessary in support of the present action, and also that the circumstance of Kellar's deposition given in the chancery suit already alluded to, was the principal cause of his abandoning this suit.   He, Kellar, says in one of his letters:  "*From its tenor* (alluding to his affidavit) *I have given up the marriage action altogether, and have now taken a new turn upon them, which will place me in a. better condition, &c.*"   The defendant's answer, filed on the 19th of June, 1841, pleaded the general issue, and claimed in reconvention of the plaintiff the sum of $1,000 ; and nothing shows that the suit was ever brought to trial.

The intervenors' claim under the sheriff's sale, as shown by the sheriff's return on the execution which issued on one of the judgments, is founded on the adjudication made to them on the 17th of December, 1842, of " all the right, title and claims of John Kellar in and to a certain suit now pending in the Court of Probates, entitled John Kellar v. The Succession of Sarah Baum, no. 1280 of the docket of said court, for the sum of $50, which was applied to pay costs, &c."   And the evidence also shows, that the intervenors became the transferrees and owners of the judgments described in their petition, by an act of transfer executed in their favor by one Thomas Powell, on the 5th of August, 1841.

After this exposition of the pleadings and of the facts disclosed by the evidence, the first object of our inquiry grows out of a bill of exceptions taken to the opinion of the judge *a quo*, who permitted the depositions of certain witnesses, taken under a commission, to be read as evidence on behalf of the intervenors.   The objections were :  1st, that it does not appear that the witnesses were sworn before a person qualified to administer an oath ; and 2nd, that Kellar had no opportunity of cross examining the witnesses.

I.  The commission is addressed to William Hardin, Esq., notary public, or any other judge, or justice of the peace in the county of Floyd, State of Indiana ; and the testimony was taken by the said William Hardin, who states in his certificate, that " the witnesses severally *subscribed and swore to their respective*

*depositions before me,*" and that their said depositions contain their full answers to all and singular the direct and cross interroga-tories, &c. We have often held that when a commission is ad-dressed to a person by name, in another State, as a special com-missioner to take depositions, he becomes an officer of the court *ad hoc*, and that this dispenses with any proof of his qualification to discharge the duties imposed on him. 1 Mart. N. S. 187. 16 La. 282, 321. The judge, therefore, did not err in receiving the depositions objected to, as having been legally taken.

II. We agree with the judge *a quo* in the opinion, that the facts intended to be proved, to wit, the marriage of John Kellar with Sarah Baum, are in support of his allegations made in his peti-tion as plaintiff, and that he cannot, therefore, be viewed as a party defendant.

On the merits, three questions have been raised by the appel-lant's counsel, which it becomes now our duty to examine. It has been contended: 1st. That the evidence does not support the allegations contained in the original and supplemental pe-titions of intervention.

2nd. That the supplemental intervention is based upon a new cause of action, and cannot be maintained.

3rd. That the plea of prescription should have been sustained.

I. We have already expressed our firm opinion that the mar-riage of John Kellar with Sarah Baum, deceased, was satisfac-torily established, and that, from the evidence, we were satisfied that she was Kellar's wife at the time of her death. Indeed, we have rarely seen a case in which the main fact at issue be-tween the parties, was more satisfactorily made out, not only from the direct evidence adduced to prove it, but also from all the other circumstances shown by the defendant, and intended to throw doubt upon its existence. Here, independently of the testimony of the witnesses who were present at the marriage ceremony, the conduct of the husband and wife in relation to a suit, in which it was deemed necessary, in order to practice a fraud, not only to deny the existence of the marriage, but also to show by the deposition of one of them, that it had never taken place, has had the effect of convincing us that they were really married, and that the declaration of the husband, was only the

result of the suggestion of his wife, and of a scheme by them formed to protect their property from seizure. They were married, but they contrived to prove that they were not; and had the fact of marriage not existed, where was the necessity of procuring evidence to prove a negative? The appellant, in endeavoring to rebut the appellees' allegations by this evidence, has proven too much, and has completed the proof of his adversaries, so far even as to show that John Kellar's conduct in that transaction is a good and sufficient ground to maintain the appellees' intervention in this suit, and to justify their allegations of fraud on which their original petition is based. It is obvious that Kellar, who joined the appellant in this appeal, and who therefore complains of the judgment which declares him to be the husband of the deceased, renews in this suit the attempt, which he made in Kentucky, to screen his property from the pursuit of his creditors, under the false pretence here that the whole belongs to his wife's succession. His application to discontinue his cause during the pendency of the intervention, evinces also, on his part, the intention of depriving his creditors of their recourse against his property, as he undoubtedly expected that, after having discontinued his action, the appellees' intervention would necessarily be dismissed; but, at the time of his attempt to discontinue, his litigious rights were under seizure; they were about being sold; he had no further control over them; and the judge *a quo* very properly rescinded the order of discontinuance thus illegally obtained.

We think, therefore, that the intervenors' allegations of intended fraud on the part of Kellar, have been substantially made out; that they had a right to intervene for the purpose of preventing the fraud, having shown themselves to be his creditors, and in danger of losing their rights from their debtor's fraudulent acts (Civil Code, art. 1985); and that all the allegations contained in the two petitions are fully supported by the evidence.

It has been urged, that the appellees have not proved that they have legally acquired the rights of Kellar, and that, as the regularity of the proceedings under the forced alienation were expressly put at issue, it was their duty to show their legality

beyond the judgment, writ of execution, and sheriff's deed, produced in evidence in support of their said rights. We think the contrary. The appellees having shown the adjudication made to them at the sheriff's sale, by the production of the judgment, writ of *fi. fa.*, and sheriff's return and deed, these were *prima facie* evidence that the formalities of the law had been complied with, and it was the duty of their adversaries to prove that they were not. This doctrine has been repeatedly and uniformly recognised in our jurisprudence. 3 La. 476. 5 Ib. 486. 9 Ib. 542. 16 Ib. 454. 18 Ib. 526. 19 Ib. 307. 2 Rob. 466. This point, however, is to some extent immaterial, as the sheriff's sale relied on may yet be disputed by Kellar's creditors, and even by Kellar himself, when the intervenors shall attempt to claim possession of the property, by virtue of said sale, contradictorily with their debtor, or with their co-creditors. It is not the main basis of the intervention, which we rather consider as made by creditors of an insolvent for the protection of their rights ; and in this sense only can we take the sale relied on, as *prima facie* evidence of the intervenors' right to interfere.

II. This question, though hardly insisted on in the argument, deserves some consideration. It is true the supplemental petition of intervention sets up new matter, based upon a fact which occurred since the filing of the original petition ; but it does not, in any manner, alter, nor change the substance of the original demand, to wit, that Kellar be recognised as the lawful husband of the deceased ; it only shows that since the inception of the suit, the plaintiff had perhaps no further right to prosecute it in his name, and that his rights and claims had apparently been transferred to another. But the action remains the same ; it operates merely a change of parties, for whose benefit it is to be acted on ; and we are not prepared to say that if, during the pendency of a suit, a third person acquires the right of the plaintiff, the former should not be permitted to intervene, and claim that the suit be carried on in his name and for his benefit. A distinction ought clearly to be made between an original action, and one by intervention. The latter is rather an incidental demand, the cause of which may have originated since the original one was substituted, and has for

its principal object the protection of the rights of the interven-
ing party against the acts or contrivances of the original par-
ties, or either of them, and even the exercise of a right contra-
dictorily with both. Code of Practice, art. 364. For instance,
if, during the pendency of a litigation between two persons, it
happens that one of them has done an act which may be preju-
dicial to another's interest, or to his rights, the latter has a
right to intervene, though the cause of complaint have arisen
since the inception of the suit. So, also, if the third party
becomes the transferree or purchaser of a litigious right before
it is brought to a final adjustment, he has necessarily the right
of intervening to claim that the suit be carried on in his name.
Here, the two rights existed successively, both originating
during the pendency of Kellar's action; but as they are not
inconsistent with each other, and have a tendency to the same
result, we cannot see any reason why the last cause of inter-
vention should be disregarded. The authorities relied on by
the appellant's counsel, 10 La. 424 and 516, are applicable to
an original action; but we cannot say that they should govern
an intervention, which, in most cases, presupposes an injury
to be sustained by the intervenor from the acts of the original
parties, or of one of them, during the pendency of the original
suit. It is manifest that if the grounds or causes of intervention
were to be limited to those existing previous to the institution
of the main action, the rights of intervening parties would very
often be defeated and sacrificed.

III. This point has been strenuously urged in the argument,
but we think it untenable. The appellant's counsel appears to
consider the appellees' intervention as a mere revocatory action,
based upon article 1984 of our Code; and he has, therefore, con-
tended, that it is prescribed by the lapse of one year. Civil
Code, art. 1989. Now, supposing the intervention to have been
instituted for that object, what is the contract or act to be
revoked, and from what time would the prescription begin to
run? It cannot be pretended that Kellar has ever made any
formal renunciation of his rights in favor of any one, nor that
the heirs of the deceased have ever acquired any right under
him, to his portion of the community with the deceased. As we

have already said, being the head or master of the community, he could not legally renounce it, but could only make a transfer of his rights. Has he ever done so? At the time the original petition of intervention was filed, his suit was pending; it had been instituted for more than three years; and the intervenors complained of his neglect in not prosecuting it, as amounting to a desistance to their prejudice, and even to a renunciation of his rights to the property of the community. But it is nowhere alleged that Kellar ever did effectually renounce, so as to divest himself of his rights, in favor of the appellant: he merely neglected to avail himself of the action which he had instituted; such neglect might have become prejudicial to the exercise of the rights of his creditors, who had good reasons to believe that he intended to defraud them. But there is a vast difference between a fraud committed passively by a debtor in not exercising the legal rights from which his creditors could be benefitted, and the active fraud which, having the effect of divesting him of his rights or property in favor of a third person, gives rise to the revocatory action. This results from the very terms of article 1984, which says: "Not only *contracts which dispose of property,* but *all others* (contracts) which are made in fraud of creditors, &c., come within the provisions of this section. *The renunciation of a succession or other right of property, the release of a debt without payment, or any other act of this kind,* may be avoided by creditors;" &c. Here, again, no contract or act of any kind was ever performed or executed by Kellar; none such is sought to be annulled or revoked by the intervenors; the executor cannot set up any title to his portion of the community by virtue of any transfer made to him; Kellar's portion never ceased to be vested in him; and if, having neglected to prosecute his suit, on the 17th of December, 1842, during the pendency of the intervention, he attempted fraudulently to discontinue his demand, it was no cause for a revocatory action, but simply a good and legal ground to authorize his creditors to complain, and to intervene in the action for the protection of their rights. By the terms of article 1985, the intervenors were authorized to exercise all the rights which their debtor could, for recovering

possession of the property to which he might be entitled, in order to make the same available for the payment of their debts. These rights the debtor had never explicitly abandoned until the 17th of December, 1842, when he moved for a discontinuance of this suit. His refusal, or neglect to prosecute his rights, cannot date but from the time of his motion, as until then the suit was pending in his name and for his benefit; and considering also, that the object of the refusal was not *to decline accepting an inheritance to the prejudice of his creditors,* but only to decline claiming possession of property, the title to which was in him for one-half, as master of the community to which he could not validly renounce, we are of opinion that the plea of prescription was properly overruled.

Upon the whole, we cannot recognise in the executor, after the fact of marriage was ascertained, any right to dispute and controvert the intervenor's legal pretensions. As representing the succession of Sarah Baum, he is entitled to the one-half of the property belonging to the community, and to nothing more; the other half belongs to John Kellar, or perhaps to the purchasers of his rights; and we cannot see any valid reason why the executor should have taken upon himself to complain of the judgment appealed from, any further than with regard to the original matter at issue between him and the surviving husband. He pretends to be entitled to the whole, notwithstanding the proof of marriage. This sounds very much like collusion between him and Kellar, for the purpose of depriving the intervenors of their just rights against their debtor. Kellar became the executor's co-appellant; but we feel authorized by the record to say, that this looks, on the part of the executor, like an attempt to assist him in the fraud which he intended to perpetrate, and that such conduct cannot receive any sanction at our hands.

*Judgment affirmed.*